Filed 7/31/14  Marriage of Cashman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of LISA E. and JOHN R. CASHMAN. | D063008 |
| LISA E. CASHMAN, | |
| Respondent, | (Super. Ct. No. D497174) |
| v. | |
| JOHN R. CASHMAN, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Susan D. Huguenor, Judge.  Affirmed in part and reversed in part.

John R. Cashman, in pro. per., for Appellant.

Stephen Temko for Respondent.

This is an appeal from the judgment of dissolution of marriage of John R. and Lisa E. Cashman.  John contends the trial court committed numerous errors in its (1) determination of child and spousal support, (2) valuation and division of community

assets, (3) evidentiary rulings at trial, (4) granting of Lisa's request for sanctions and denial of John's request, and (5) denial of John's posttrial motion seeking disqualification of the trial judge.  We conclude that only one of John's claims—that the trial court erroneously characterized his premarital bank account as community property—has any merit, and we reverse the judgment in that respect only.

John also contends the trial court erred when it denied his motion for new trial. He argues the court erroneously concluded it lacked jurisdiction to decide the motion because it had not been ruled on within 60 days, as required by Code of Civil Procedure section 660.  While we agree with John that the trial court erred in its conclusion regarding its lack of jurisdiction, we nonetheless conclude the error was not prejudicial because the primary grounds upon which John based his motion are directly addressed in his contentions on appeal, and the secondary grounds similarly lack merit.

FACTUAL AND PROCEDURAL SUMMARY

John and Lisa were married on September 8, 1990, and had two daughters (ages 16 and 14, respectively, as of trial).  In 1998, Lisa and John founded Human Biomolecular Research Institute (HBRI), a nonprofit research institute funded primarily by federal grants.  Lisa had a doctorate in pharmacy and was a licensed pharmacist.  She served as chief executive officer of HBRI with a salary in 2005 of $78,000.  John was HBRI's scientific director, with a salary in 2005 of approximately $140,000.

In April 2006, Lisa stopped working as a full-time HBRI employee, but continued on as a part-time consultant.  In May, Lisa told John she had filed for dissolution, but she had not.  Around the same time, John reduced his annual salary from around $140,000 to

2

around $80,000. No other HBRI employee had taken a salary reduction in the prior four-plus years. Within a month, John took an interest-free, $50,000 loan from HBRI. Although the loan was due to be repaid within six months, John made no payments but instead obtained two extensions to November 2011. In 2007 or 2008, John took another $50,000 loan from HBRI, also due in November 2011.

Lisa filed for dissolution on June 1, 2006. Later that month, she stopped working at HBRI altogether after John physically threatened her at work.

After June 2006, Lisa stayed in the family home, but slept in a separate bedroom. She moved out in December 2006. She briefly stayed in her parents' home, then rented a separate residence from them.

In February 2007, the trial court ordered John to pay temporary spousal and child support, divided custody of the children equally, and awarded John the exclusive use of the residence. The court encouraged the parties to cooperate regarding division of the community furniture in the residence, and reserved jurisdiction over the issue. In addition, the court admonished Lisa, who was not working, to "immediately . . . secure employment."

Lisa found a part-time job doing pharmacy writing in July 2007. In October 2008, she obtained full-time employment at MedImpact, a pharmacy benefits management company. Her starting pay was a base salary of $125,000, plus a bonus of $14,000. She received a raise in 2009, and by the time of trial in December 2010 was receiving a base salary of $138,000, plus a $12,000 bonus. Lisa was able to leave work early two days each week to help the daughters with their extracurricular activities.

3

When Lisa moved out of the family home, she took only her clothes and personal belongings that were in her separate bedroom. After Lisa and John were unable to agree on the division of the remaining personal property and furniture, Lisa requested that the court appoint a special master to oversee the process. In March 2007, the court appointed Eugene M. McMurdy as special master. McMurdy had difficulty arranging a meeting with John, and once McMurdy finally arranged one two months later, John canceled. Lisa eventually obtained her furniture about 18 months after she moved out, when John left it on the driveway for her to retrieve in plain view of the neighbors.

In June 2010, Lisa and John participated in a mandatory settlement conference with attorney Emory L. Boutilier. The parties apparently were close to settling, so agreed to continue mediating before Boutilier at his office the following week. The case did not settle.

In October 2010, the court heard a request by John to modify child and spousal support, to compel Lisa's production of her tax returns for years 2007-2009, and for sanctions under Family Code section 271[1] due to Lisa's alleged failure to produce tax returns. Lisa agreed to produce the requested tax returns in November. The court reserved the remaining issues for trial.

Trial was conducted over six days in December 2010 through February 2011. The parties submitted written closing arguments in March 2011. The court issued a tentative statement of decision in May 2011, to which John objected. The court issued its final

---

[1] All undesignated statutory references are to the Family Code.

4

statement of decision (FSOD), which addressed John's objections, on July 28, 2011.  The court ruled, in pertinent part, as follows:

*Support:*  The court found Lisa's income to be $12,647 per month, including bonus.  The court found John's income to be $11,900 per month, based on his sustained ability to cover monthly expenses of $11,000 to $12,754 without incurring any debt.  The court's finding was based on John's "ability to borrow from HBRI with no written documentation, no interest and no time frame for repayment.  He drives a car paid for by HBRI and uses a company credit card."  Based on its findings regarding income, the court denied spousal support and set guideline child support at zero.

*Family Residence:*  The court valued the family residence at $1,060,000 based on an appraisal conducted by appraiser Gerald Longwell and the testimony of the parties.  The court gave John the opportunity to purchase the residence, or else to list it for sale.

*Dellbrook Property:*  The court found Lisa and John were each entitled to reimbursement of approximately $16,000 under section 2640 for separate property contributions each made toward a home in San Francisco that John purchased prior to marriage (the Dellbrook property), but which was refinanced with community funds during the marriage.  The FSOD reiterated the court's evidentiary ruling excluding John's *Moore/Marsden*[2] expert because he "was found to not be an expert."

---

[2]	When community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro tanto interest in the property.  (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 371-372; *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436-440; *In re Marriage of Branco* (1996) 47

*Gifts from Lisa's Parents:*  The court ruled that Lisa was entitled to reimbursement from the community of $44,000 for separate property gifts she received from her parents in 2003 and 2004.

*Morgan Stanley Account:*  The court found that a Morgan Stanley Dean Witter account (the Morgan Stanley account) opened by John before marriage was community property to be divided equally.

*Attorney Fee Reimbursements:*  The court observed that Lisa had received $20,000 more in attorney fee reimbursements from an attorney trust account than John had.  The court ordered that the difference be credited when the trust account was divided.

*Sanctions:*  The court found Lisa did not breach her fiduciary duty and, accordingly, denied John's request for sanctions.  The court, however, sanctioned John $20,000 based on the finding that he "ha[d] frustrated the policy of the law to promote settlement of litigation and where possible to reduce the cost of litigation by encouraging cooperation."

On August 25, 2011, John filed a statement seeking to disqualify the trial judge, Judge Susan D. Huguenor, on the basis that John "recently discovered that there was an undisclosed financial interest and family connection between" Judge Huguenor and Lisa's parents—that they live in the same residential development and, consequently, are members of the same homeowners association.  After John corrected a procedural deficiency in his initial request, the court assigned the matter to Judge Jeffrey B. Jones of

Cal.App.4th 1621, 1628 [applying *Moore/Marsden* analysis to property refinanced with a community loan].)

the Imperial County Superior Court. Judge Jones denied John's request. John did not pursue a writ proceeding challenging the denial.

On August 26, 2011, John attempted to appeal the FSOD.

A judgment incorporating the FSOD was filed November 3, 2011, and the court clerk mailed the parties a notice of entry of judgment the same day.

In January 2012, John filed a motion to compel and an order to show cause requesting that Lisa file an updated income and expense declaration. At the February hearing on John's requests, the court sua sponte set aside the November 3, 2011 judgment, as John's previous appeal from the FSOD was still pending. The court then denied without prejudice John's motions because they were postjudgment motions and the judgment had been vacated.

John then requested that this court dismiss his first appeal on June 5, 2012. The appeal was dismissed and remittitur issued the following day.

On August 22, 2012, the trial court filed a new judgment incorporating the FSOD. The same day, the court clerk mailed a notice of entry of judgment to the parties' trial counsel. On September 6, John filed a motion for a new trial. The court heard the motion on October 31 and November 2. On November 2, the court denied the motion by operation of law. The court reasoned it lost jurisdiction 60 days after the notice of entry of judgment was mailed on August 22, 2012.

John timely appealed.

7

DISCUSSION

Before we address the merits, we note John is an in propria persona litigant and, as such, is " 'entitled to the same, but no greater, consideration than other litigants and attorneys. . . . Further, the in propria persona litigant is held to the same restrictive rules of procedure as an attorney.' " (*Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113, 1125-1126.) Accordingly, we have only considered those contentions that John has properly presented under separate headings and subheadings. (Cal. Rules of Court, rule 8.204(a)(1)(B) ["Each brief must: [¶] . . . [¶] (B) [s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"]; (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4 ["The failure to head an argument as required by [Cal.] Rules of Court, rule [8.204(a)(1)(B)], constitutes a waiver."] (*Opdyk*).)

## I. *Child and Spousal Support*

John contends the trial court erred in its child and spousal support determinations by erroneously imputing income to him and by failing to impute income to Lisa. He also contends he is entitled to a refund for support payments he made during a seven-month period when he was unaware Lisa had gained full-time employment. We disagree.

### A. *Standard of Review*

We review child and spousal support orders—including the determination whether to impute income for purposes of calculating support—for an abuse of discretion. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282-283 (*Cheriton*); *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1393.) In doing so, we determine whether

8

substantial evidence supports the factual findings made in connection with the order.  (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730.)  In applying the abuse of discretion standard, we do not substitute our judgment for that of the trial court; we consider only whether any judge reasonably could have made the order.  (*Id.* at pp. 730-731.)  The court must, however, follow established legal principles in exercising its discretion, and we apply the independent or de novo standard of review in determining whether it did so.  (*Id.* at p. 731.)

Under the substantial evidence standard of review, we review the entire record to determine whether there is substantial evidence supporting the fact finder's factual determinations (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874), viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1254-1255).  The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the trier of fact's findings.  (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429-430, fn. 5.)  Credibility is an issue of fact for the trier of fact to resolve (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622), and the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614).

9

B.      *John's Income*

John contends the trial court erred "when it imputed John income without any evidentiary basis for th[e] amount."  We disagree with John's characterization of this issue for two reasons.

First, we disagree with John's conclusion that the trial court *imputed* income to him—erroneously, or otherwise.  In general, a court imputes income to a spouse or parent based on that person's earning capacity,[3] not his actual income.  (§ 4320 [spousal support]; 4058, subd. (b) [child support]; *Cheriton*, *supra*, 92 Cal.App.4th at p. 308 ["a trial court may consider earning capacity in determining spousal support, just as it may with child support"].)  Here, however, the court did not base its support determinations on John's earning capacity; rather, the court determined John's actual income was higher than he disclosed on his income and expense declarations.

Second, substantial evidence supports the trial court's determination of John's actual income.  John's trial testimony and income and expense declarations routinely showed him meeting monthly expenses far in excess of his stated income, without incurring any debt.[4]  For example, in his January 2007 income and expense declaration,

---

3      Generally speaking, earning capacity is composed of the ability, willingness, and opportunity to work.  (*In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367, 1372.)

4      At trial, John attempted to backtrack by arguing his monthly expenses were "estimated" or "proposed," even though his income and expense declarations—signed under penalty of perjury—identified them as "actual" expenses.  The trial court was not required to accept as true John's explanation.  (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830 ["[T]he trier of fact may believe and accept as true only part of a witness's

10

John listed approximately $11,700 in monthly expenses and claimed to have net monthly income of approximately $3,900, yet he was able to pay the expenses without borrowing. In an income and expense declaration dated six months later, John was again able to cover about $11,700 in monthly expenses on the same declared income, without incurring debt. In April 2009, John was still able to cover approximately $11,400 per month in expenses on declared monthly income of only about $1,800, again without borrowing money. In October 2009, John was again able to cover monthly expenses of approximately $11,000 on net income of about $3,950. In June 2010, John was able to meet an increased $12,754 in monthly expenses on net income of approximately $4,200, without incurring debt. In all of these months, John was also able to contribute $1,666 toward his retirement. Under similar circumstances, other courts have disregarded a party's disclosed income when it is contradicted by conflicting statements by that party. (E.g., *In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 38 [basing income on statement in loan application that contradicted income tax return]; *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 109 ["loan application, standing alone, constitutes substantial evidence that Father's income was $40,000 per month"].)

The court's determination is further supported by John's apparent structuring of his income. He initiated a $50,000 pay cut in 2006, at a time when no other HBRI employee had taken a pay cut in over four years and when HBRI had as much as $350,000 cash in an investment account. Additionally, HBRI's chief operating officer testified at trial that

testimony and disregard the rest. On appeal, we must accept that part of the testimony which supports the judgment."].)

11

the company saved $70,000 as a result of Lisa's departure in 2006. John paid no interest on his $50,000 loan from HBRI; indeed, despite the loan's six-month repayment term, by the time of trial four years later, John still had made no payments, but instead obtained two two-year extensions, and borrowed an additional $50,000 from HBRI.[5] John used an HBRI vehicle 90 percent of the time,[6] and had an HBRI credit card in his name. In 2009, John received a $17,000 lump-sum payment from HBRI for extra work he did under a contract between HBRI and a third party. After HBRI withheld taxes from the lump sum, John ran the remainder through his consulting firm such that he netted only $2,400 in income, which he identified on his June 2010 income and expense declaration as $200 per month from self-employment income. John received several five-figure tax refunds, which he used to pay his monthly expenses. Based on John's structuring of his income, he "is in no position to complain that the trial court drew adverse inferences" in making its support determinations. (*In re Marriage of Calcaterra & Badakhsh*, *supra*, 132 Cal.App.4th at p. 38; *In re Marriage of Chakko*, *supra*, 115 Cal.App.4th 104 at p. 109 ["A spouse who is the owner of a successful business and who has control of his or her income can structure income and the payment of expenses to depress income. This is not fair if it inures to the detriment of children. Here, the trial court drew the inference that

---

[5]    While the first loan was memorialized in a promissory note, it does not appear that the second loan was documented. John asserts in his opening brief that he repaid the loans, but the record—including his own testimony—contradicts that assertion.

[6]    John testified he made a $4,000 down payment on HBRI's vehicle with his own personal funds.

Father's structuring of income and expenses was an attempt to minimize child support obligations."].)

Citing *In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332, John contends the trial court should have based its finding of his income on his tax returns. While income tax returns are presumptively correct as to a parent's income in a child support proceeding, that presumption is rebuttable. (*Ibid.*; *M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 558 ["Ordinarily, a party's challenge to the presumption of correctness is based on the argument that income or benefits *not* included on the other parent's federal tax returns should nonetheless be included in gross income for calculation of guideline support."].) Not only does the evidence recounted above effectively rebut the tax-return presumption, but additional trial testimony also suggested John's tax returns were not reliable for purposes of determining support. For example, John's 2009 tax return may not have reflected all of his royalty income, John reported a different amount than Lisa for capital gains arising from the sale of an investment property they jointly owned, and John's consulting expenses were high in relation to his income.[7]

Based on John's income and expense declarations, his structuring of his income, and questions concerning his tax returns, we conclude the trial court did not abuse its discretion in determining John's income.

---

[7]  For example, in 2009, John reported consulting income of $957, but expenses of $4,648 for legal/tax services, $3,386 for travel expenses (though he could not recall where he had travelled), and $3,000 for meals and entertainment.

13

C.    *Lisa's Income*

John contends the trial court "erred when it did not impute income to Lisa even though she was immediately employable."  We disagree.  "[N]o authority permits a court to impute earning capacity to a parent unless doing so is in the best interest of the children.  By explicit statutory direction, the court's determination of earning capacity must be 'consistent with the best interest of the children.' " (*Cheriton*, *supra*, 92 Cal.App.4th at p. 301, citing § 4058, subd. (b) ["The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children."].)  John fails to address how imputing income to Lisa would be in the best interests of their children.

For her part, Lisa argues convincingly that the trial court did not abuse its discretion.  For example, Lisa testified she did not voluntarily quit working at HBRI but, rather, left after "being physically threatened at work" by John.  After she left HBRI, Lisa devoted her time to caring for the parties' two daughters.  Lisa testified, "I feel I have a duty to care for my children first."  Numerous courts have recognized "[t]ime spent with children is to be valued." (*In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 20 [collecting cases].)

John also argues the trial court erred by failing to impute as income to Lisa recurring gifts she received from her parents in the form of annual cash gifts and reduced rent and other expenses.  We are not persuaded.  "[W]hile regular gifts of cash may fairly represent income, that might not always be so.  Therefore, the question of whether gifts should be considered income for purposes of the child support calculation is one that

14

must be left to the discretion of the trial court." (*In re Marriage of Alter*, *supra*, 171 Cal.App.4th at p. 737 [trial court did not abuse discretion in imputing income based on father "receiving regular cash payments from his mother for over a decade"].) Regarding the cash gifts to Lisa, the evidence was undisputed that although Lisa's parents gave each of their three daughters approximately $22,000-$24,000 each year between 2003 and 2009, the parents gave no cash gift to any daughter in 2010 because Lisa's father was "in the construction business, and construction business [was] in bad shape." The trial court did not abuse its discretion in declining to impute income to Lisa based on the interrupted history of gifts.

Similarly, although Lisa's parents gave Lisa checks for $1,000 in January, February, May, and June 2010, Lisa testified those funds were designated for the daughters' horseback riding, and that is what she used them for. John fails to explain how it would be in his daughters' best interests to impute those funds as income to Lisa.

Regarding subsidized rent, John has forfeited the argument by failing to support it with adequate citations to supporting record evidence. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 ["If a party fails to support an argument with the necessary citations to the record, that portion of the brief may be stricken and the argument deemed to have been waived."].) In any event, substantial evidence establishes Lisa was not receiving a gift in the form of subsidized rent from her parents. After Lisa moved out of the family home in December 2006, she briefly lived with her parents (where she paid $2,500 per month for rent), then rented a house from them for $2,800 per month. Although it appears John is arguing the fair market rental value of the rented

15

house is more than $13,000 per month, Lisa's mother testified that fair market value for rent was $2,800 per month, which she determined by speaking with a realtor.

Based on these circumstances, we conclude the trial court did not abuse its discretion in declining to impute income to Lisa.

D.     *Refund*

John appears to argue he is entitled to a refund for support payments he made and employment benefits he paid for during a seven-month period when Lisa was working at MedImpact but had not yet notified John or the court.  His argument, however, is forfeited because it is spread throughout his briefing and is not preceded by appropriate headings or supported by cogent argument or authority.  (Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk*, *supra*, 34 Cal.App.4th at p. 1830, fn. 4; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 ["The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived."].)

Even if John had not forfeited this argument, we would find it unpersuasive.  Lisa testified she intended to notify John of her new employment via a vocational evaluation of her that was to be conducted at John's request.  Due to John's delay in signing his own proposed stipulation for that evaluation, Lisa's counsel's vacation, and the evaluator's delay in setting the evaluation meeting, Lisa did not end up meeting with the evaluator until March 2009.  Lisa testified she was surprised by this delay, as she had expected the evaluation to occur much sooner.  The trial court was entitled to accept Lisa's explanation, and did not abuse its discretion in doing so.

16

John's refund argument also ignores that the trial court's initial support awards were based on his reduced, declared income, not on the higher amount the court ultimately determined at trial. Even when the court made its initial support award, the court expressed suspicion regarding John's disclosed income:

> "I think there is ample evidence that Mr. Cashman is capable of earning substantially more than he is earning, taking home at the moment, and frankly under circumstances that look a little suspicious. The timing is suspicious. What is reflected in [HBRI's chief operating officer] Handley's Declaration is that there has been some significant financial distress over the past few years. If this is the case, why was there a decision suddenly in May, coincidentally at the time the Petition is filed, for a reduction in salary?"

After receiving additional evidence at trial, the court did not abuse its discretion in concluding John's income was not as stated in 2007, but was substantially more "from 2007 until the time of trial" because he had "an ability to have as much income as he needs from HBRI." In addition, the court 's initial support award did not factor in John's consulting income, which included at least $15,000 in 2009. Under all these circumstances, the trial court did not abuse its discretion in denying John a refund.

II.    *Failure to Trace Under Section 2640*

John contends the trial court erred by granting Lisa's request under section 2640 that the community reimburse her $44,000 for her separate property contributions to a community investment. We disagree.

Section 2640, subdivision (b) provides that, "In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement . . . , the party shall be reimbursed for the party's contributions to the

17

acquisition of the property of the community property estate to the extent the party traces the contributions to a separate property source."  "The amount of reimbursement recoverable is the value of the separate property contributions at the time they were made."  (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057.)  "Commingling of separate and community property does not alter the status of the separate property interest so long as it can be traced to its separate property source."  (*Ibid*.)  "Whether the spouse claiming a separate property interest has adequately met his or her burden of tracing to a separate property source is a question of fact and the trial court's holding on the matter must be upheld if supported by substantial evidence."  (*Id*. at pp. 1057-1058.)

Lisa testified her parents gave her gifts of $22,000 in each of 2003 and 2004.  She introduced a letter from her parents stating "[t]his money was given as personal gifts to Lisa and intended for her only."  John stipulated the point at trial.  These gifts were presumptively Lisa's separate property.  (§ 770, subd. (a)(2) ["Separate property of a married person includes . . . [¶] (2) All property acquired by the person after marriage by gift . . . ."].)  Lisa testified, and trial exhibits substantiated, she deposited the gift checks into a community bank account at California Bank and Trust.

Lisa also testified she and John netted $750,000 in proceeds from the sale of a condominium in 2004.  They invested those sale proceeds in two investments with Equastone that totaled $825,000.  The first was a $325,000 loan that was repaid in 2006 and deposited into an attorney trust account.  The second was a $500,000 investment in a value fund, which Lisa and John still held at the time of trial.  Lisa testified she contributed the $44,000 she had received as gifts from her parents to bridge, in part, the

18

gap between the $750,000 in condominium proceeds and the $825,000 total investment in Equastone.

The trial court granted Lisa's request for reimbursement of her $44,000 contribution as follows:

> "[Lisa] is granted her . . . section 2640 reimbursement for her separate property in the amount of $44,000. Exhibit M[8] and the testimony of [Lisa's parents] and [Lisa] with regards to the years 2003 and 2004, substantiate the reimbursement of funds due to [Lisa]. [Lisa's parents] gave to [Lisa] funds which were later transferred from [Lisa's] personal account to [a community] account. There was no contrary evidence submitted."

John attacks this finding on several bases, none of which has merit. First, he argues Lisa could not have contributed her separate property gifts toward the Equastone investment because the parties made that investment in June 2005 and Lisa did not open her "personal account"—from which, according to the FSOD, she ostensibly transferred her contribution—until six months later. We conclude John has forfeited this factual argument by failing to raise it with the trial court, either in his written closing argument or in his objection to the tentative statement of decision. (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879.) In any event, John's contention is contradicted by substantial evidence in the record, which establishes Lisa deposited the gift checks into a community checking account, not a personal account.[9]

---

8    Trial exhibit M consisted of the letter from Lisa's parents, copies of the 2003 and 2004 gift checks, and copies of bank deposit slips.

9    We note Lisa's written closing argument asserted—apparently erroneously—that she deposited the gift checks into a personal account before transferring them to a

19

Second, John argues the court's finding runs afoul of section 2581, which provides, generally, that "property acquired by the parties during marriage in joint form . . . is presumed to be community property." John forfeited this argument, too, by failing to raise it with the trial court. (*Richmond v. Dart Industries, Inc.*, *supra*, 196 Cal.App.3d at p. 879.) But even if we were to consider the merits, and even if the section 2581 presumption applied, Lisa would still be entitled to seek reimbursement under section 2640. (§ 2640; *In re Marriage of Rico* (1992) 10 Cal.App.4th 706, 710; *In re Marriage of Cochran*, *supra*, 87 Cal.App.4th at p. 1057 ["Commingling of separate and community property does not alter the status of the separate property interest so long as it can be traced to its separate property source."].)

We therefore conclude the trial court did not err in finding Lisa entitled to reimbursement of the $44,000 she traced to gifts from her parents.

### III. *Exclusion of John's Moore/Marsden Expert Witness*

John contends the court erred by excluding the expert opinion of Christopher Whitaker, an accountant John retained to provide a *Moore/Marsden* analysis to allocate between separate and community property the appreciation in value of the Dellbrook property. We are not convinced.

---

community account, from which they were then invested with Equastone. This is the likely genesis of the FSOD's harmless conclusion that Lisa initially deposited the gift checks into a personal account.

Evidence Code section 801, subdivision (b) makes an expert's opinion admissible if it is

> "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

" 'Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value.' " (*In re Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563.) This is because the "value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed." (*Ibid.*) Consequently, "[a]n expert opinion has no value if its basis is unsound." (*Id.* at p. 564.) "[A] trial court can determine whether there is a reasonable basis for an expert opinion by examining the opinion and the matters on which the expert relies, and does not require evidence from a second level of experts in making this determination." (*Id.* at p. 565.) We review a trial court's decision whether to admit expert testimony for an abuse of discretion. (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1349.)

Whitaker opined there was no increase in value between the date of marriage and the time the property was refinanced about three years later such that the community would not receive any allocable appreciation. He testified fair market value of the property at the times of purchase, marriage, and refinance were necessary factors in his

21

determination of the property's premarital and postmarital appreciation. (See generally *In re Marriage of Marsden*, *supra*, 130 Cal.App.3d at pp. 438-439 [comparing premarital and postmarital appreciation]; *In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, 1287 [value at time of marriage is a necessary factor].) His valuation of the property at the times of purchase and refinance were supported by the purchase price and an appraisal, respectively, but his valuation at the time of marriage was supported by an Internet blog provided to him by John. Whitaker admitted he did not know who prepared the blog and had not "independently verified" it, but nonetheless relied on it because it was "consistent with [his] recollection of what happened in the real estate market in Northern California during that time period."

On cross-examination, Lisa challenged the bases of Whitaker's opinion. She elicited that Whitaker was not an appraiser, and that he had not done any of the following: (1) conducted a market analysis on the property; (2) reviewed an analysis of prices from the date of John's purchase to the date of marriage; (3) used the Zillow Web site, as he had on past occasions; and (4) conducted an historical appraisal, due to cost. In addition, Whitaker admitted he did not live in San Francisco, did not know where in the city the property was located, and did not know the median price of a home in San Francisco in 1990.

At the conclusion of Whitaker's testimony, Lisa objected and moved to strike Whitaker's opinion because "the information he's relied on seemingly is unreliable." The court sustained the objection, which it reiterated in the FSOD. We find no abuse of discretion. Whitaker acknowledged each *Moore/Marsden* factor was "very important"

22

and that the result was dependent upon the data—"to the extent that one of the factors is not correct, then the result is not correct by the same amount."  Whitaker's opinion on one of those factors—the property's value on the date of marriage—was based on an unverified blog.  We note that even John's own testimony contradicted the blog.  While Whitaker testified the blog established the property's value remained unchanged between 1990 and 1993, John testified the property appreciated from $300,000 to $330,000—a 10 percent increase.[10]  Accordingly, we conclude the trial court did not err by excluding Whitaker's opinion testimony.

IV.    *Valuation of the Residence*

John contends the trial court erred in its valuation of the family home by relying on a four-year-old appraisal.  "The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal."  (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 632.)  We find that to be the case here.

By stipulation of the parties, appraiser Gerald Longwell appraised the residence in 2006.  He valued it at $1,060,000.  Lisa testified she thought the appraisal was on the low side because it listed the house as having a two-car garage and linoleum flooring in the laundry room, when in fact the house had a three-car garage and tile flooring in the laundry room.  Lisa also testified she kept up on real estate values in her community by monitoring real estate listings, Web sites, and speaking with a friend who is a realtor.

---

10    Consequently, of course, John's opinion also conflicted with Whitaker's opinion, which valued the property at $270,000 in both 1990 and 1993.

23

Based on that, Lisa testified home values in her community for homes the size of the family residence "have stayed . . . pretty solid."

The trial court found the family residence was "community property with a value of $1,060,000. The Court based the finding as to the value of the home on the appraisal by Gerald Longwell and the testimony of the parties." The trial court's valuation is, thus, "within the range of the evidence" provided by Lisa and Longwell. (*In re Marriage of Duncan*, *supra*, 90 Cal.App.4th at p. 632; *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 351 ["the law is that the owner of property is qualified to give his opinion of its value"], citing Evid. Code, § 813.)[11]

## V. *The Morgan Stanley Account*

John contends the trial court erred by characterizing the Morgan Stanley account as community property instead of as his separate property. We agree.

### A. *Additional Background*

John testified at trial that he opened the Morgan Stanley account in 1988, prior to marriage. He started the account with $30,000 and estimated it was worth $60-70,000 at the time of trial. John testified neither he nor Lisa ever added any money to the account; the increase in value was attributable solely to the broker's internal trading activity. John introduced two account statements at trial that showed the account was held by John and

---

[11] John's suggestion that the court erred by disregarding his testimony that the residence was worth only $850,000 misunderstands our standard of review. The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact. (*Rupf v. Yan*, *supra*, 85 Cal.App.4th at pp. 429-430, fn. 5.) Substantial evidence in the form of Lisa's testimony and Longwell's appraisal supported the trial court's valuation of the residence.

Lisa as joint tenants. John testified he did not know when Lisa's name first appeared on the account or how it got there—he had no knowledge of adding Lisa to the account and never intended to gift Lisa half of the account.

Lisa testified she did not know how much money was in the account at the time of marriage or whether the community made any contributions to the Morgan Stanley account because John took care of all the investments. Lisa had no recollection of ever seeing the account statements that were admitted as trial exhibits.

John's objections to the trial court's tentative statement of decision sought "[c]onfirmation that [the] Morgan Stanley . . . account be deemed John's separate property . . . ." The court stated in the FSOD that it "has again reviewed [the account statement exhibits,] which show title in joint tenancy between the parties." Accordingly, the trial court characterized the Morgan Stanley account as community property.

B.    *Analysis*

John contends the trial court should have characterized the Morgan Stanley account as his separate property because he opened it with his separate property funds before marriage and Lisa failed to establish an effective transmutation to community property. Lisa initially argued the trial court's characterization is supported by Evidence Code section 662's " 'form of title' presumption," under which "the description in a deed as to how title is held presumptively reflects the actual ownership status of the property." (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 344; Evid. Code, § 662 ["The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof."].)

25

While this appeal was pending, the Supreme Court decided *In re Marriage of Valli* (2014) 58 Cal.4th 1396 (*Valli*), in which the court held "Evidence Code section 662's form of title presumption . . . does not apply when it conflicts with the transmutation statutes." (*Id.* at p. 1406.) In that case, the husband used community property funds during marriage to purchase a life insurance policy that named his wife as the sole owner and beneficiary. (*Id.* at p. 1399.) At dissolution, the parties disagreed on the policy's characterization. (*Ibid.*) The trial court characterized it as community property because it was acquired during marriage with community funds, but the Court of Appeal reversed. (*Ibid.*) The Supreme Court, in turn, reversed the Court of Appeal.

The Supreme Court noted the statutory presumptions that property acquired by a spouse before marriage is that spouse's separate property (§ 770, subd. (a)) and property acquired by a spouse during marriage generally is community property (§ 760), but explained that "[m]arried persons may, through a transfer or an agreement, transmute— that is, change—the character of property from community to separate or from separate to community. ( . . . § 850.) A transmutation of property, however, 'is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.' ( . . . § 852, subd. (a).) To satisfy the requirement of an 'express declaration,' a writing signed by the adversely affected spouse must expressly state that the character or ownership of the property at issue is being changed. (*Estate of MacDonald* (1990) 51 Cal.3d 262, 272.)" (*Valli*, *supra*, 58 Cal.4th at p. 1400.)

The court first rejected the wife's argument that "the transmutation requirements apply only to transactions between spouses, and not to one spouse's acquisition of property from a third party" such as the husband's acquisition of the insurance policy from the insurance company. (*Valli*, *supra*, 58 Cal.4th at pp. 1401, 1405.) The court then addressed the wife's argument that the policy was her separate property not through transmutation, but under Evidence Code section 662's form of title presumption. (*Id*. at pp. 1406-1407.) The Court of Appeal had agreed with the wife, stating " 'because the form of title presumption applies . . . a transmutation theory is not involved.' " (*Id*. at p. 1406.) But the Supreme Court found this conclusion erroneous, explaining "[w]e need not and do not decide here whether Evidence Code section 662's form of title presumption ever applies in marital dissolution proceedings. Assuming for the sake of argument that the title presumption may sometimes apply, *it does not apply when it conflicts with the transmutation statutes*." (*Id*. at p. 1406, italics added.)

We requested and received supplemental briefing from the parties "on the effect, if any, of [*Valli's*] discussion of the form of title presumption . . . on the proper characterization of the Morgan Stanley account." Lisa essentially concedes that under *Valli* the trial court's apparent reliance on the form of title presumption to characterize the Morgan Stanley account as community property cannot stand.[12] She argues instead that

---

[12]   Lisa's only attempt to escape *Valli's* holding is to label it dicta. This attempt fails because, having concluded the transmutation statutes applied to the transaction between the husband and the insurance company, it was then necessary for the court to resolve the apparent conflict between the transmutation statutes and the form of title presumption upon which the Court of Appeal relied.

27

the characterization "may be sustained under another rationale, . . . section 2581," which provides that "property acquired by the parties during marriage in joint form, including property held in . . . joint tenancy, . . . is presumed to be community property." She claims this presumption applies because "the undisputed evidence is the Morgan Stanley account was acquired in joint names during the marriage." (Fn. omitted.) We disagree.

Lisa's argument fails because it confuses the *acquisition* of property during marriage with the mere *retitling* of it. "[S]ection 2581 by its terms expressly applies to property 'acquired by the parties during marriage in joint form.' The *acquisition* of property during marriage by purchase or gift is clearly different from an interspousal transmutation of property *already* owned by one or both spouses." (*In re Marriage of Delaney* (2003) 111 Cal.App.4th 991, 998.) It is undisputed that John "already owned" the Morgan Stanley account when he married Lisa and that no community funds were ever added to it. Thus, the account was not *acquired* during marriage, and section 2581's community property presumption is simply inapplicable.

Instead, to characterize the account as community property by virtue of it having been retitled in joint tenancy during marriage, Lisa must satisfy section 852, subdivision (a)'s transmutation requirements—an " 'express declaration' " signed by John that expressly changes the character or ownership of the account. (*Valli*, *supra*, 58 Cal.4th at p. 1400.) Our review of the account statements on which Lisa and the trial court relied to invoke the form of title presumption indicates they are insufficient to establish a transmutation under section 852, subdivision (a). (See *Estate of Petersen* (1994) 28 Cal.App.4th 1742, 1754-1755 ["reference to joint tenancy on [a money market] account

28

statement does not satisfy the requirement of an express written declaration" because "there are no signatures on the statement," "the account statement does not reveal that the legal effect of the joint tenancy designation was to alter the character or ownership of community funds," and "the statement does not indicate [husband and wife] consented to such a change"]; *In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 590 [husband's transfer of his separate property stock from his name into his wife's name insufficient to constitute transmutation]; *Estate of Bibb* (2001) 87 Cal.App.4th 461, 470 [Department of Motor Vehicles printout showing husband's joint retitling of his separate property automobile during marriage insufficient].) Accordingly, we reverse the judgment with respect to its characterization of the Morgan Stanley account as community property.

## VI. *Excess Attorney Fees Awarded to Lisa*

John contends the court erred by allowing Lisa to be reimbursed $20,000 more than him for attorney fees. This contention is wholly without merit. The FSOD specifically addresses this issue and provides the overpayment for Lisa's attorney fees "is to be credited at the division of the trust account." The trial court did not err.

## VII. *Judicial Disqualification*

John contends the trial court erred by denying his motion to disqualify Judge Huguenor on the basis that she lives in the same community, and is a member of the same homeowners association, as Lisa's parents (and Lisa, when she briefly lived with her parents postseparation). Lisa responds that John forfeited his right to appeal this issue by failing to seek writ review, and further contends John's contention fails on the merits. We agree with Lisa in both respects.

29

"Under our statutory scheme, a petition for writ of mandate is the exclusive method of obtaining review of a denial of a judicial disqualification motion." (*People v. Mayfield* (1997) 14 Cal.4th 668, 811; Code Civ. Proc., § 170.3, subd. (d) ["The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate . . . ."].) "The petition for the writ shall be filed and served within 10 days after service of written notice of entry of the court's order determining the question of disqualification." (Code Civ. Proc., § 170.3, subd. (d).)

John concedes he did not seek writ review of the order denying his disqualification motion. He argues he was excused from doing so because the court's order denying his motion to disqualify "was postmarked [eight] days after the decision," which resulted in John receiving the ruling "via mail well beyond the jurisdictional limit of 10 days." John's argument, however, confuses *entry* of the order and *service* of the order. "[I]t is '*service* of written notice of entry of the court's order determining the question of disqualification' which commences the period for seeking review by way of a petition for writ of mandate." (*D.M. v. Superior Court* (2011) 196 Cal.App.4th 879, 885, quoting Code Civ. Proc., § 170.3, subd. (d), italics added.) Further, where, as here, service of the order is made by mail, Code of Civil Procedure section 1013, subdivision (a) extends by five calendar days the time in which the challenging party must file a writ petition. (Code Civ. Proc., § 170.3, subd. (d).) John did not seek writ review within 15 days of service of the order denying his disqualification motion. He has therefore forfeited this issue. (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 811; Code Civ. Proc., § 170.3, subd. (d).)

30

But even if we were to reach the merits, we would conclude John failed to establish Judge Jones erred in denying John's motion to disqualify Judge Huguenor. Judge Jones denied John's motion because, among other reasons, John failed to establish that Judge Huguenor had "a financial interest in the subject matter in a proceeding or in a party to the proceeding" within the meaning of Code of Civil Procedure section 170.1, subdivision (a)(3)(A). As Judge Jones correctly observed, neither Lisa's parents nor their homeowners association were a "subject matter in," or a "party to" the proceeding. John offers no explanation of how Judge Huguenor's "decision would have a direct and ascertainable impact upon [her] or [her] property." (*Central & West Basin Water Etc. Dist. v. Wong* (1976) 55 Cal.App.3d 191, 195 ["[A] judge will not be disqualified unless his decision would have a direct and ascertainable impact upon him or his property. Such an impact will not be deemed to exist unless the effect of his decision on his interest can be predicted in advance with assurance."].)

The authorities upon which John relies are inapposite. *Hemingway v. Superior Court* (2004) 122 Cal.App.4th 1148, 1153 involved a peremptory challenge under Code of Civil Procedure section 170.6, not a motion to disqualify for cause under section 170.1, as John's motion was. *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 475 examined whether a homeowners association's meetings and newsletter were public forums for purposes of an anti-SLAPP motion to strike under Code of Civil Procedure section 425.16. And California Judges Association Opinion No. 63 relates to disqualification of a hearing judge when a judicial colleague (or the colleague's family member) or other court employee has an interest in the case. Nothing

31

in the record suggests Lisa's parents are judges or court employees. We therefore conclude that even if John had not forfeited this issue, he failed to meet his burden of establishing error.

## VIII. *The Mediator's Testimony*

John contends the trial court erred by allowing mediator Boutilier to testify regarding communications that occurred during mediation. He further contends the error prejudiced him because "the Judge's decision . . . imposing sanctions on John was based on allegations and dishonest material offered by Mr. Boutilier . . . ." Lisa counters that John waived the mediation privilege by failing to timely object at trial on that specific basis. She further contends John invited the error by also questioning Boutilier at trial about settlement terms discussed during mediation. Finally, Lisa contends John has failed to establish that any error was prejudicial. We conclude (1) John has neither waived nor invited error, and (2) the trial court erred in allowing the mediator to testify about mediation communications, but (3) John has failed to meet his burden of establishing the error was prejudicial.

### A. *Additional Factual Background*

Lisa called mediator Boutilier as a witness at trial. John objected as follows: "I would like to object to this witness if he's going to discuss settlement discussion. I think that it is barred by the Evidence Code." The court directed Lisa's counsel to make an offer of proof as to Boutilier's proposed testimony. That offer of proof proposed testimony on two topics. First, Lisa would have Boutilier testify the parties agreed to pay him out of community funds held in a trust account, but that John subsequently reneged.

32

Second, on the topic of sanctions under section 271, Lisa's counsel intended to question Boutilier regarding "the cooperation of [the] parties" during mediation. The judge admonished, "[Boutilier]'s not going to be discussing the substance of the settlements." Lisa's counsel acknowledged, "[t]hen he won't." At that point, John's counsel proposed questioning Boutilier—a certified family law specialist—as an expert on disclosures relating to John's request for sanctions against Lisa. Lisa's counsel responded, "[t]hat's fine," and the court directed that Boutilier be sworn in.

Boutilier testified he presided over a mandatory settlement conference between Lisa and John on June 3, 2010. Lisa's questioning established the parties were close to settling at the conclusion of the conference, so they agreed to continue discussions as a private mediation at Boutilier's office. The parties agreed to pay Boutilier his usual hourly rate for his continued work as mediator. Boutilier then testified regarding the substance of the settlement communications that occurred during the follow-up mediation session. In particular, Boutilier testified John said several times during mediation he wanted to "punish" Lisa and that "she needed to pay"; John had done a "flip-flop" on his preferred disposition of the residence; and there were allegations of "irregularities" in John's income, which included the $50,000 paycut/loan and use of HBRI's company credit card. Boutilier testified that sometime after the follow-up mediation session, John notified Boutilier by e-mail that he had fired his attorney and would be unable to participate in further mediation sessions until he retained new counsel. Boutilier never heard from John or his new counsel regarding further mediation.

Following Lisa's direct examination of Boutilier, John examined him as an expert regarding disclosure requirements regarding parties' finances and income. John's questioning also touched on some details of settlement discussions about which Boutilier had already testified.

Following redirect, Lisa's counsel suggested that if the court were to order that Boutlier's mediation fees be paid from community funds, that Boutilier's fee for testifying as an expert also be paid from those funds. John's counsel objected, explaining that Lisa "asked [Boutilier] here to testify to the settlement conference provisions of what was settled and I objected because that's settlement conference discussions. [¶] I only asked the court to give me leeway about his expertise in regards to my *Feldman* sanctions." The court responded, "[t]here was no objection to that, so I'm not going to rule on that."

B.    *Governing Law Regarding Mediation Confidentiality*

" 'California's Legislature has a strong policy favoring mediation as an alternative to litigation. Because mediation provides a simple, quick, and economical means of resolving disputes, and because it may also help reduce the court system's backlog of cases, it is in the public interest to encourage its use.' " (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 578 (*Simmons*).) Accordingly, the Legislature "enacted [Evidence Code] section 1115 et seq., creating an extensive statutory scheme governing mediation confidentiality and its exceptions." (*Ibid*.) The Legislature designed the mediation confidentiality statutes to "promote 'a candid and informal exchange regarding events in the past . . . . This frank exchange is achieved only if the participants know that what is said in the mediation will not be used to their detriment through later court proceedings

34

and other adjudicatory processes.' " (*Foxgate Homeowners' Assn. v. Bramalea California, Inc*. (2001) 26 Cal.4th 1, 14 (*Foxgate*).)  "[C]onfidentiality is essential to effective mediation . . . ."  (*Ibid*.)

Evidence Code section 1119 "governs the general admissibility of oral and written communications made during the mediation process."  (*Simmons*, *supra*, 44 Cal.4th at p. 578.)  Evidence Code section 1119, subdivision (a) states, in pertinent part, that "[e]xcept as otherwise provided in this chapter:  [¶] (a) No evidence of anything said . . . for the purpose of, in the course of, or pursuant to, a mediation . . . is admissible or subject to discovery . . . ."  Subdivision (b) extends the protection to writings that are "prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation . . . ."[13]

Similarly, Evidence Code section 1121 provides that "[n]either a mediator nor anyone else may submit to a court or other adjudicative body, and a court or other adjudicative body may not consider, any report, assessment, evaluation, recommendation, or finding of any kind by the mediator concerning a mediation conducted by the mediator, other than a report that is mandated by court rule or other law and that states only whether an agreement was reached . . . ."  (See also *Foxgate*, *supra*, 26 Cal.4th at

---

[13]    To "prevent[ ] parties from using a mediation as a pretext to shield materials from disclosure" (Cal. Law Revision Com. com., 29B Pt. 3B, West's Ann. Evid. Code (2009 ed.) foll. § 1120, p. 402), Evidence Code section 1120, subdivision (a) provides that "[e]vidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation or a mediation consultation."

p. 14 [Evidence Code section 1121 "prohibits the court from considering a report that includes information not expressly permitted to be included in a mediator's report."].)

"To carry out the purpose of encouraging mediation by ensuring confidentiality, the statutory scheme . . . unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception." (*Foxgate*, *supra*, 26 Cal.4th at p. 15.) Key express statutory exceptions include (1) the express waiver by all participants, either in writing or in an oral recording that is subsequently memorialized in writing in a timely fashion (Evid. Code, § 1122); and (2) certain agreements reached during mediations (*Id*., §§ 1123 [written agreements], 1124 [oral agreements, when certain recordation requirements are met].) "Except in cases of express waiver or where due process is implicated," our Supreme Court has instructed that "judicially crafted exceptions to mediation confidentiality are not appropriate." (*Simmons*, *supra*, 44 Cal.4th at p. 582.)[14] Consequently, "the judicial doctrines of equitable estoppel and implied waiver are not valid exceptions to the strict technical requirements set forth in the mediation

---

[14]     The only case that recognizes a sufficient due process right is *Rinaker v. Superior Court* (1998) 62 Cal.App.4th 155, 167, in which the court compelled a mediator to testify because the court found the minor's due process right to confront witnesses in a juvenile delinquency proceeding involving criminal conduct outweighed the statutory right to mediation confidentiality.  By contrast, "the mere loss of evidence pertinent to the prosecution of a lawsuit for civil damages does not implicate such a fundamental interest." (*Cassel v. Superior Court* (2011) 51 Cal.4th 113, 135 [declining to adopt an exception to the mediation confidentiality statutes in legal malpractice actions].)  Nor does insulating a party's bad-faith negotiations during mediation justify the judicial creation of an exception to mediation confidentiality.  (*Foxgate*, *supra*, 26 Cal.4th at p. 18, fn. 14 [noting, however, that the mediation confidentiality statutes do not "prohibit[] a party from revealing or reporting to the court about noncommunicative conduct" such as failing to bring an expert to mediation when ordered to do so].)

confidentiality statutes . . . ."  (*Cassel v. Superior Court*, *supra*, 51 Cal.4th at p. 126;

*Simmons*, at p. 588 ["Both the clear language of the mediation statutes and our prior

rulings support the preclusion of an implied waiver exception."].)

"The remedy for violation of the confidentiality of mediation is that stated in

[Evidence Code] section 1128."  (*Foxgate*, *supra*, 26 Cal.4th at p. 18.)  Evidence Code

section 1128 provides as follows:

> "Any reference to a mediation during any subsequent trial is an
> irregularity in the proceedings of the trial for the purposes of Section
> 657 of the Code of Civil Procedure.  Any reference to a mediation
> during any other subsequent noncriminal proceeding is grounds for
> vacating or modifying the decision in that proceeding, in whole or in
> part, and granting a new or further hearing on all or part of the
> issues, if the reference materially affected the substantial rights of
> the party requesting relief."

(See also Code Civ. Proc., § 1775.12 ["Any reference to the mediation . . . during any

subsequent trial shall constitute an irregularity in the proceedings of the trial for the

purposes of [Code Civ. Proc., §] 657."].)

C.      *Analysis*

In light of the principles just discussed, we reject Lisa's contentions regarding

waiver and invited error.  The mediation confidentiality statutes cannot be impliedly

waived by litigation conduct—they can only be waived "in cases of express waiver or

where due process is implicated."  (*Simmons*, *supra*, 44 Cal.4th at p. 582 [no waiver even

where the party who later asserted the mediation privilege had previously submitted

evidence of events that occurred during mediation].)  Lisa does not assert either of these

37

bases here.  Therefore, "judicially crafted exceptions to mediation confidentiality are not appropriate" in this case.  (*Ibid*.)

Having considered the merits, we must conclude the trial court erred.  It did so by admitting "evidence of [some]thing said . . . in the course of . . . a mediation," in violation of Evidence Code section 1119, subdivision (a).  In addition, the court erred by allowing Boutilier to "submit to [the] court . . . [a] report, assessment, evaluation, recommendation, or finding of any kind by the mediator concerning a mediation conducted by the mediator," in violation of Evidence Code section 1121.  The court also erred by "consider[ing]" Boutilier's mediation report.[15]  (*Ibid*.)

But our inquiry does not end with a finding of error.  Rather, to warrant reversal and a new trial, the error must be prejudicial.  (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1161, citing Cal. Const., art. VI, § 13; *In re Marriage of Kieturakis* (2006) 138 Cal.App.4th 56, 94 [wife "was not prejudiced even if [mediator]'s evidence was wrongly admitted"].)  We are not persuaded the trial court's error was prejudicial here.

First, the court's receipt of Boutilier's testimony is mitigated by the fact that much of his testimony was duplicative of Lisa's.  For example, Lisa testified John took a $50,000 pay cut and immediately borrowed $50,000 from HBRI and repeatedly changed his position on disposition of the house.  Lisa also testified John frustrated settlement.

---

15    We know the trial court considered Boutilier's report because the FSOD references the mediation sessions and recites that "[John] changed his mind each time and changed counsel after each session."

And John testified he had an HBRI credit card in his name (though he denied using it for personal use) and drove an HBRI car 90 percent of the time.

Second, wholly apart from Boutilier's testimony, the court's imposition of sanctions on John was supported by at least five additional grounds: (1) John's salary reduction and loan from HBRI; (2) his lack of cooperation in the division of household furnishings, including placing Lisa's furniture on the driveway in public view; (3) his delay in the furniture appraisal process, which dragged on for 18 months; (4) causing multiple court hearings in connection with personal property division and placing the daughters in therapy; and (5) taking unreasonable positions unsupported by law, which required extensive court time. These other circumstances are more than ample to support the trial court's award of sanctions against John. Thus, although the trial court erred in allowing Boutilier to testify regarding the substance of mediation communications, we nonetheless conclude the error was not prejudicial.

IX. *Denial of John's Request for Attorney Fees for Breach of Fiduciary Duty*

John contends the trial court erred because it "lacked discretion to deny John's attorney's fee request for Lisa's breach of fiduciary duties in concealing assets, income and tax records." However, the trial court found Lisa had not breached her fiduciary duty to John. John failed to cite, and we are not aware of, any authority that requires a trial court to award attorney fees to a party who fails to prevail on his breach of fiduciary duty claim. Thus, John has failed to persuade us that the trial court lacked discretion to deny him fees.

Assuming John intended for us to construe this issue as a challenge to the trial court's exercise of its discretion in finding Lisa did not breach her fiduciary duty, we would still find no error. To begin with, John has forfeited this issue by failing to properly head it in his briefing. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk*, *supra*, 34 Cal.App.4th at p. 1830, fn. 4.) He has also forfeited several of the factual bases underlying his argument by failing to support them with specific citations to record evidence.[16] (*Duarte v. Chino Community Hospital*, *supra*, 72 Cal.App.4th at p. 856.) The merits of John's remaining bases fail as well.

The bases of John's breach of fiduciary duty claim that are properly before us are that Lisa failed to (1) timely and voluntarily produce final federal tax returns and a form W-2, (2) produce certain of her own state tax returns, (3) produce tax returns for their daughters, and (4) disclose a "secret" bank account. We are not persuaded by any of these bases.

Regarding Lisa's federal tax returns, John complains of having been forced to file a motion to compel to obtain Lisa's returns for 2007-2009. That motion was resolved by stipulation, pursuant to which Lisa produced responsive documents prior to trial. As for John's complaint that he never received Lisa's 2009 form W-2, Lisa testified she was prepared to produce it at the next mediation session, but John cancelled the session. John now complains for the first time that the federal tax returns Lisa produced were

---

[16] These include John's assertions regarding Lisa's use of community funds for postseparation living and personal expenses and disposition of certain checks and bank accounts.

40

inadequate because they were "non-final." John forfeited this issue by failing to raise it at trial. (*In re Marriage of Falcone & Fyke*, *supra*, 164 Cal.App.4th at p. 826 ["an appellate court will ordinarily not consider procedural defects or erroneous rulings where an objection could have been, but was not raised below"]; *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002 ["Failure to object to the ruling or proceeding is the most obvious type of implied waiver."].) In addition, John relied on those same returns in his closing argument and in his objections to the tentative statement of decision. He cannot now complain of their nonfinal nature. (*In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501 ["[W]here a party by his conduct induces the commission of an error, under the doctrine of invited error, he is estopped from asserting the alleged error as grounds for reversal."].)

As for John's claims regarding nondisclosure of state tax returns, Lisa testified she filed state tax returns in Arizona and Colorado only because an Equastone investment she held with John owned property in those states.[17] She owned no other property in either state. Because Lisa's Arizona and Colorado gains from Equastone were reported on her federal tax returns, which Lisa provided to John, we see no prejudice arising from John's lack of receipt of state tax returns from Arizona and Colorado regarding an investment he jointly held with Lisa.

John's challenge regarding Lisa's failure to produce the daughters' tax returns also lacks merit. Lisa testified the daughters had California Uniform Transfers to Minors Act

---

[17] John testified he was not required to file a tax return in Arizona.

(CUTMA) accounts over which she was the custodian, and that she had provided account statements to John. Each daughter had two CUTMA accounts: one at Wells Fargo funded by gifts of stock from Lisa's parents, the other at California Bank & Trust funded by the daughters' babysitting earnings and birthday gifts from grandparents. Lisa testified she paid all the taxes arising from the daughters' Wells Fargo CUTMA accounts. Consequently, according to Lisa, when the daughters received tax refunds, Lisa deposited the refunds into her own account since she was the one that paid the taxes. John obtained Lisa's bank records showing her deposit of those refunds, and his counsel examined Lisa about them at trial. Under the circumstances, we see no prejudice arising from John not receiving the daughters' tax returns.

Finally, John asserts he discovered Lisa had a "secret" bank account. Lisa testified the funds in that account included a gift from her parents and personal injury settlement proceeds from a car accident that the court found were her separate property. John does not properly dispute any of these characterizations on appeal. That failure is critical because the separate property nature of the funds in the account are dispositive of John's claim.

John's closing argument sought sanctions for breach of fiduciary duty under sections 1101, subdivision (g),[18] and 2107, subdivision (c).[19] This court has previously

---

18    Section 1100, subdivision (g) provides as follows: "Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs. The value of the asset shall be determined to be its

construed section 1101 as authorizing sanctions only upon nondisclosure of community property, not separate property. (*In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 594.) In addition, to recover sanctions under section 2107, subdivision (c), John must, himself, be in compliance with his disclosure obligations. (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 289 ["we conclude that only a 'complying party,' meaning a party that has served a preliminary or final declaration of disclosure, is entitled to seek an award of monetary sanctions against the other party for failure to comply with the applicable disclosure requirements"].) Lisa correctly observes the record does not reflect John timely filed a final declaration of disclosure. John implicitly acknowledged this deficiency when he sought to augment the record on appeal to include a final declaration of disclosure that he filed in the trial court in January 2014. We denied that request.

Based on the above, John has not shown Lisa's conduct was so egregious as to compel the trial court to conclude Lisa breached her fiduciary duty to John. Absent such a showing, the trial court did not abuse its discretion by denying John's request for attorney fees as sanctions.

---

highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court."

19  Section 2107, subdivision (c) provides as follows: "If a party fails to comply with any provision of this chapter, the court shall, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party. Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust."

43

## X.    *John's New Trial Motion*

John contends the trial court erred when it denied his new trial motion by operation of law on the basis the motion was not ruled on within 60 days, as required by Code of Civil Procedure section 660.  Lisa counters that "even if the motion was erroneously denied by operation of law, it makes no difference" because John suffered no prejudice inasmuch as his motion would have been denied on the merits for reasons already addressed in this appeal.  We agree with both parties.

### A.    *The Trial Court Erred by Denying John's Motion for Lack of Jurisdiction*

Code of Civil Procedure section 660 establishes the time in which a trial court must hear a motion for new trial:  "the power of the court to rule on a motion for a new trial shall expire 60 days from and after [1] the mailing of notice of entry of judgment by the clerk of the court pursuant to [Code of Civil Procedure] Section 664.5 or [2] 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, or [3] if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial."  "The 60-day period under [Code of Civil Procedure] section 660 is mandatory and jurisdictional." (*Dodge v. Superior Court* (2000) 77 Cal.App.4th 513, 517.)

Here, the trial court denied John's motion by operation of law because it was not ruled on within 60 days of the court clerk's mailing of notice of entry of judgment to John.  John cites *Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 64 for the proposition that "to qualify as a notice of entry of judgment under Code of Civil Procedure section 664.5, the clerk's mailed notice

44

must affirmatively state that it was given 'upon order by the court' or 'under section 664.5' and a certificate of mailing the notice must be executed and placed in the file." We find *Van Beurden* dispositive here.

The clerk's notice of entry of judgment gives no indication that it was given " 'upon order by the court' " or " 'under [Code of Civil Procedure] section 664.5.' " (*Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.*, *supra*, 15 Cal.4th at p. 64.) Accordingly, under *Van Beurden*, the clerk's notice could not have started the 60-day jurisdictional period for ruling on John's new trial motion.[20] Under Code of Civil Procedure section 660, then, the 60-day period commenced upon the earlier of "service on the moving party by any party of written notice of the entry of the judgment" or "filing of the first notice of intention to move for a new trial." It does not appear from the record that Lisa ever served John with notice of entry of judgment. Therefore, the 60-day period in which the trial court had jurisdiction to rule on John's motion commenced on the day John filed his notice of intention to move for new trial— September 6, 2012. The court's denial of John's motion by operation of law on November 2, 2012, was within the 60-day period that commenced on September 6, and was thus erroneous.

---

20    The clerk's notice would have been ineffective, in any event, because it was mailed to John's former trial counsel after she had filed a notice of withdrawal of attorney of record in which she provided John's last known address. (*Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 509 [service ineffective where clerk mailed notice to attorney's former address]; Code Civ. Proc., § 1013, subd. (a).)

B.     *The Trial Court's Erroneous Denial of John's New Trial Motion Was Not Prejudicial*

Our conclusion that the trial court erroneously denied John's new trial motion by operation of law does not, standing alone, compel reversal.  Rather, John must also demonstrate prejudice from that erroneous denial.  (*Sherman v. Kinetic Concepts, Inc.*, *supra*, 67 Cal.App.4th at p. 1161.)  Contrary to John's assertion, this is true even though Lisa apparently did not oppose John's motion with counter-affidavits.  (*Tapia v. Barker* (1984) 160 Cal.App.3d 761, 766 ["Where no affidavits or declarations are introduced to counter the evidence of jury misconduct proffered on a new trial motion, the acts are deemed established, and the only issue is whether they are harmful or prejudicial."].)  Largely for reasons already discussed above, we conclude John was not prejudiced by the trial court's denial of his new trial motion.  (E.g., *Weisenburg v. Molina* (1976) 58 Cal.App.3d 478, 486 [finding no prejudice from erroneous denial of new trial motion based on lack of jurisdiction where appellate court considered merits of motion by way of appellant's contentions on appeal].)

John filed his new trial motion while he was unrepresented.  It addressed a variety of issues, some of which have already been discussed above, some of which have not.  By the time the court heard John's motion, he had retained new counsel.  At that hearing, John's counsel acknowledged the "motion and points and authorities are somewhat convoluted," and "attempt[ed] to make it very clear and distill the facts" by "argu[ing] five main points as to why a new trial is deserved."  John's five points were the following: (1) suppression of evidence, including tax returns, and concealing assets and income from

46

John and the court; (2) improper imputation of income to John; (3) exclusion of Whitaker's *Moore/Marsden* opinion; (4) valuation of the family residence based on a four-year-old appraisal; and (5) mischaracterization of the Morgan Stanley account. With the exception of the Morgan Stanley account, we have already explained above why the court did not err in its treatment of these issues. As for the Morgan Stanley account, we have already concluded the trial court erred and will reverse the judgment in that respect. Therefore, there is no need for a new trial on any of these issues.

John's written motion raised additional issues not addressed by his lawyer at oral argument, and none of which warrant a new trial. First, John argued Lisa's trial counsel engaged in misconduct by characterizing HBRI as a family business instead of a nonprofit entity. John suffered no prejudice because the trial court expressly acknowledged in the FSOD that HBRI is a nonprofit entity. Second, John alleged Lisa engaged in frivolous patent litigation for nonexistent royalties from HBRI patents. John suffered no prejudice, however, because the trial court found the litigation meritorious and, in any event, only ordered that John produce an annual accounting. Third, John cited Lisa's counsel's "lack of candor" in failing to disclose the trial judge lived in the same community as Lisa's parents. We have already addressed this issue in detail above. Fourth, John contends the trial court committed an " 'error in law' whereby the court assigned community funds to purchase numerous personal items exclusively used by [Lisa.]" John's motion, however, merely reargues the evidence introduced at trial and fails to identify any legal error the trial court allegedly committed. Fifth, John contends the trial court erred by reimbursing Lisa for her $44,000 contribution to the Equastone

47

investment.  We have already addressed this issue at length above.  Finally, John contends the trial court erred in selecting June 1, 2006, as the date of separation instead of an earlier date.  John's trial brief, however, designated June 1 as the date of separation.

We therefore conclude that although John has established that the trial court erred by denying his new trial motion by operation of law, that error was not prejudicial.

DISPOSITION

The portion of the judgment characterizing the Morgan Stanley account as community property is reversed.  The superior court is directed to modify the judgment to characterize the account as John's separate property.  In all other respects, the judgment is affirmed as modified.  The order denying John's motion for new trial is affirmed.  Lisa is awarded her costs on appeal.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.